## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GREGORY L. REYES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 17-cv-1643 (JDB) |
| v. | ) | |
| | ) | |
| JEFFERSON B. SESSIONS III, in his | ) | |
| official capacity as Attorney General of | ) | |
| the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

Plaintiff is a convicted felon.  While Plaintiff was the CEO of a public company, Brocade Communications Systems, Inc. ("Brocade"), he defrauded Brocade's shareholders by a scheme of backdating stock options and then lying about it.  Through this unlawful endeavor, Plaintiff misappropriated hundreds of millions of dollars, including $13 million in backdated stock option grants that he personally received.  For this, Plaintiff was convicted of nine criminal violations of the United States securities laws, sentenced to eighteen months in prison, and ordered to pay a $15 million fine.

In this case, Plaintiff insists he should be permitted to possess a firearm, notwithstanding his status as a convicted felon.  Plaintiff's offenses fall squarely within the firearms prohibitions set forth in 18 U.S.C. §§ 922(g)(1) and 922 (d)(1), which prohibit possession of a firearm by, and transfer of a firearm to, a person convicted of a crime "punishable by imprisonment for a term exceeding one year."  Nothing in Plaintiff's opposition warrants excusing him from these longstanding firearm dispossession laws.

1

As a threshold matter, Plaintiff lacks standing to challenge Section 922(d)(1), which only prohibits transfer of firearms, not possession thereof.  But, in any event, Plaintiff's challenges to both Sections 922(g)(1) and 922(d)(1) should be dismissed on the merits because: (1) Plaintiff's underlying felony conviction does not fall within a statutory exception from the firearms disability; (2) application of the statutes to Plaintiff does not violate the Second Amendment; and (3) the statutes do not violate Plaintiff's right to equal protection.

Accordingly, Defendants Motion to Dismiss should be granted.

## I.  PLAINTIFF LACKS STANDING TO CHALLENGE SECTION 922(d)(1)

Plaintiff lacks standing to challenge 18 U.S.C. § 922(d)(1).  Section 922(d)(1) prevents the transfer of "any firearm or ammunition" to a person who "has been convicted in any court of [] a crime punishable by imprisonment for a term exceeding one year."  Because Plaintiff claims only that he wishes to "acquire and [] possess firearms," not that he wishes to transfer a firearm, Compl. ¶ 28, Plaintiff has failed to allege facts plausibly demonstrating that Section 922(d)(1) applies to him and can be enforced against him.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Nothing in Plaintiff's opposition dictates otherwise.  Plaintiff claims his standing is established by "binding precedent," relying on *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011).  Pl.'s Mem. at 6 (ECF No. 13).  But, *Dearth* did not address Section 922(d)(1) at all.  Rather, *Dearth* addressed a challenge to 28 U.S.C. §§ 922(a)(9) and 922(b)(3), which together prevent a person who lives outside the United States from lawfully purchasing a firearm in the United States, and it nowhere directly addressed the question at issue here – that is, whether a person

who has no intention of transferring a firearm nonetheless has the right to challenging a prohibition against transferring a firearm.  614 F.3d at 500.[1]

By contrast, the only court to address standing under 18 U.S.C. § 922(d)(1) held that a plaintiff lacked standing to challenge the constitutionality of Section 922(d)(1) because, where a person wishes only to acquire and possess a firearm, not to sell one, he cannot establish an injury based on the statute.  *Wilson v. United States*, No. 3:05-0238, 2006 WL 519393, at *3 (M.D. Tenn. Feb. 28, 2006).  The instant case is indistinguishable from *Wilson*, and this Court should reach the same conclusion here.

## II.   PLAINTIFF'S FELONY CONVICTION IS NOT SUBJECT TO A STATUTORY EXCLUSION FROM THE FIREARMS PROHIBITIONS OF SECTIONS 922(g)(1) AND 922(d)(1).

Plaintiff cannot dispute that he is a convicted felon whose crimes are "punishable by imprisonment for a term exceeding one year."  18 U.S.C. §§ 922(g)(1) and 922(d)(1).[2]  Instead,

---

[1] While *Dearth* involved a challenge to both a statute prohibiting receipt, and a statute prohibiting the sale, of firearms to persons who live outside the United States, it did not include a challenge to the "seller" statute on the basis that the plaintiff had no intention to sell a firearm.  Rather, the central question in *Dearth* was whether standing could be established absent the government first denying the plaintiff a firearms permit or license.  614 F.3d at 502.  The Court held that the absence of a permit requirement in the regulatory scheme was "of no moment" because it had "thwart[ed]" the plaintiff's "continuing desire to purchase a firearm." *Id.* at 502-03.  Plaintiff also cites a Fifth Circuit case, *NRA v. ATF*, 700 F.3d 185 (5th Cir. 2012), which concerned a challenge to 18 U.S.C. § 922(c)(1), a statute that prevented federal firearms licensees from selling handguns to law-abiding adults under the age of twenty, not Section 922(d)(1).  To the extent *NRA* could be deemed analogous to the statutory scheme here, it is not binding on this Court.  But, in any event, *NRA* is distinguishable because there the NRA had filed suit on behalf of its Federal Firearms Licensee (FFL) members, *id.* at 188, who as FLLs regularly sold firearms.  No similar plaintiffs are present here.  Moreover, any reliance on *NRA* is undercut by a more recent Fifth Circuit decision, *Bezet v. United* States, No. 17-30303, --- Fed. Appx. ---, 2017 WL 4876311 (5th Cir. Oct. 27, 2017), in which the court held that a plaintiff lacked standing to challenge tax and registration laws for the transfer of firearms, because he had not alleged that he wished to transfer a firearm.  *Id.*, at *4; *see also Lane v. Holder*, 703 F.3d 668, 672 (4th Cir. 2012) (holding that plaintiffs lacked standing because "the laws and regulations they challenge do not apply to them but rather to the [Federal Firearms Licensees] from whom they would buy handguns").

[2] Defendants henceforth address Plaintiff's substantive arguments relating to Section 922(d)(1) only in the alternative, in the event he Court were to reject Defendants' standing arguments and hold that it has jurisdiction over this claim.

Plaintiff contends that he is not subject to the firearms disability set forth in Sections 922(g)(1) and 922(d)(1), relying on a limited statutory exclusion for offenses "pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices."  18 U.S.C. § 921(a)(20)(A) (the "exclusion").  The exclusion does not encompass Plaintiff's crimes, which include securities fraud and making false filings with the SEC, falsifying corporate books and records, and making false statements to auditors.

To determine whether the exclusion applies to Plaintiff's felony convictions, Plaintiff asks this Court to reject the clear "elements test" that has been unanimously adopted by the four Courts of Appeals to address the scope of the statute.  *See* Pl.'s Mem. at 17-23.  Under the elements test, courts have held that, a criminal offense only "pertains to," or is "similar" to, antitrust violations, unfair trade practices, or restraints of trade, if it required the government to prove an adverse effect on competition and consumers as an element of the predicate crime.[3]  As explained below, the elements test is the proper and logical framework for considering Plaintiff's claims; and application of the test demonstrates that Plaintiff's crimes do not qualify for the Section 921(a)(20)(A) exclusion.

### A.    Applicability of the Statutory Exclusion Should be Determined based on the "Elements Test" that Has Been Uniformly Applied by Circuit Courts.

Every court to address 18 U.S.C. § 921(a)(20)(A) has rejected Plaintiff's theory, and concluded "that not all offenses related to the regulation of business practices fall within the [Section 921(a)(2)(A)] exclusion."  *United States v. Schultz*, 586 F.3d 526, 530 (7th Cir. 2009) (citing cases from the Second, Fifth, and Eighth Circuits; *see also, e.g., United States v. Stanko*,

---

[3]  Plaintiff repeatedly refers to the "elements" test as "the Government's test," in an apparent attempt to minimize the fact that the test is a judicial creation.  *See* Pl.'s Mem. at 17-18, 20-23.

491 F.3d 408, 415 (2007) ("[The exclusion] does not extend to all business-related offenses.").[4]

Rather, the exclusion is limited and applies only to offenses "pertaining to" or that are "similar"

to the three types of offenses that Congress specifically enumerated – antitrust violations, unfair

trade practices, and restraints of trade.  18 U.S.C. § 921(a)(20)(A); *see also Stanko*, 491 F.3d at

414 (providing a detailed analysis of the statutory text).  "'Antitrust violations' refers to

violations of laws that promote the unrestrained interaction of competitive forces within the

marketplace.  'Unfair trade practices,' sometimes referred to as 'unfair competition,' occurs

when one entity passes off its products as those of another, thereby harming consumers and other

businesses."  *Dreher v. ATF*, 943 F.Supp. 680, 683 (W.D. La. 1996), *aff'd sub. nom.*, 115 F.3d

330 (5th Cir. 1997).

The elements test is the consistent framework the Courts of Appeals have applied to

determine whether an offense "pertains to" or is "similar" to the three enumerated categories that

are excluded by Section 921(a)(20)(A).  *See Stanko*, 491 F.3d 408 (holding that the exclusion did

not apply to a Federal Meat Inspection Act conviction); *United States v. Coleman*, 609 F.3d 699,

706 (5th Cir. 2010) (same for conspiracy to pirate encrypted satellite signals and infringe a

---

[4] Plaintiff attempts to treat this on-point body of case law as a mere afterthought.  Rather than apply the relevant case law, Plaintiff embarks instead on what he terms a "broad[] inquiry into questions of statutory purpose, structure and history."  *Id.* at 22; *see id.* at 8-21. From this, Plaintiff incorrectly concludes that the "'elements test' is not a sound interpretation of the statute." *Id.* at 18.  Plaintiff's analysis is flawed for several reasons.  First, Plaintiff's textual analysis purports to prove that "the Congressional purpose [of Section 921(a)(20)(A) is] to extend coverage beyond the listed offenses." Pl.'s Mem. at 8-11.  But, there is no dispute about the fact that the exclusion applies beyond the three enumerated categories.  To the contrary, Defendants *agree* that the exclusion applies to offenses that both pertain to and/or are similar to antitrust violations, unfair trade practices, and restraints of trade.  Indeed, that is precisely the category of additional defenses that the "elements" test is designed to identify. Second, Plaintiff argues that Congress "established the business crimes exclusion" because it determined that "permanently disarming persons who[] committed nonviolent offenses raised no genuine concerns that their possession of firearms would pose a threat to public safety."  *Id.* at 10.  Nothing in the legislative history supports Plaintiff's proposition (and he cites nothing for it).  In fact, the legislative history indicates the exact opposite.  *See infra* Part II.C (discussing the legislative history of the Gun Control Act, and the fact that Congress intended to disable both violent and non-violent felons).

5

copyright); *United States v. Schultz*, 586 F.3d 526, 530 (7th Cir. 2009) (same for trafficking in counterfeit telecommunications instruments); *United States v. Meldish*, 722 F.2d 26, 28 (2d Cir. 1983) (same for importing merchandise by means of false customs declaration); *United States v. Miller*, 678 F.3d 649 (8th Cir. 2012) (same for fraudulent check cashing scheme); *see also Dreher*, F.Supp. at 683 (W.D. La. 1996) (same for mail fraud and conspiracy to commit mail fraud); *United States v. Kruckel*, Crim. A. No., 92-611 (JBS), 1993 WL 765648 (D.N.J. Aug. 13, 1993) (same for tax evasion).[5] Under the "elements test," a conviction only falls within the business practices exclusion if it requires "the Government to prove an effect on competition or consumers as an element of the offense." *Stanko*, 491 F.3d 417. To meet this test, an underlying conviction must have required the Government to prove a direct effect on competition – mere "incidental effects are not relevant." *Schultz*, 586 F.3d at 530.

Plaintiff's attempts to discredit this precedent lack merit, and his request for this Court to invent its own test should be rejected. First, Plaintiff argues that the "elements" test is faulty because courts have used it to determine both whether an offense "constituted" an unfair trade practice, *see Meldish*, 722 F.3d at 28 (2d Cir. 1983),[6] and also whether an offense is "similar" to antitrust and/or unfair trade, *see Stanko*, 491 F.3d 408; *Coleman*, 609 F.3d at 706; *Schultz*, 586 F.3d at 530. *See* Pl.'s Mem. at 21. From this, Plaintiff incorrectly infers that the test must be faulty, because applying this same test to identify both actual unfair trade practices and other

---

[5] *United States v. McLemore*, 792 F. Supp. 96 (S.D. Al. 1992), is the sole case to consider the exclusion and not apply the elements test. The court held that odometer rollback is an "unfair trade practice," notwithstanding the government's arguments that the violation did not depend on whether it had an effect on competition or consumers. Defendants maintain that *McLemore* is an outlier, and that the Court should follow the well-reasoned opinions of the numerous courts discussed above.

[6] *United States v. Meldish*, 722 F.3d 26, 28 (2d Cir. 1983), was decided before the statute encompassed "other similar offenses relating to the regulation of business practices," and thus only applied the "elements" test to determine whether an offense "constituted" an unfair trade practice.

"similar" offenses would render the latter subclasses of offenses "a null set." *Id.* at 21-22.

Plaintiff's theory misunderstands the very purpose of the elements test, which is to identify

predicate offenses that contain the *same* hallmark elements as antitrust and unfair trade offenses

– *viz.,* those that require the Government to prove an effect on consumers and competition.  In

other words, the very purpose of the elements test is to identify offenses that are similar to

antitrust and unfair trade practices precisely *because* they share those hallmark qualities.  *See*

*Stanko*, 491 F.3d at 408; *Coleman*, 609 F.3d at 706; *Schultz*, 586 F.3d at 530; *Miller*, 678 F.3d at

649.

Nor is Plaintiff's remaining objection to the elements test compelling.  Plaintiff postulates

that applicable case law does not support application of the "elements" test because the Fifth,

Seventh and Eighth Circuit Courts of Appeals did not explicitly declare that the sole outlier case,

a district court case from the Southern District of Alabama, *see supra* note 6, was "wrongly

decided."  The fact that these Courts of Appeals did not expressly "overrule" an unrelated district

court decision (from outside their jurisdiction) does not change the fact that these courts adopted

the elements test as the best logical framework to use.

For the same reasons as found by the Second, Fifth, Seventh, and Eighth Circuits, this

Court should apply the elements test to determine whether Plaintiff is subject to a statutory

exclusion from the firearm dispossession laws.

**B.**     **Under the Requisite Elements Test, Plaintiff's Felony Convictions are not
Excluded from the Firearms Prohibitions because they do not "Pertain to,"
nor are they "Similar" to Antitrust Violations, Unfair Trade Practices, or
Restraints of Trade**

Plaintiff was convicted of nine counts of violating the United States securities laws,

including: (1) securities fraud and making false filings with the SEC; (2) making false statements

to auditors; and (3) falsifying corporate books and records.   None of these offenses required the

Government to prove a direct effect on consumers or competition. Thus, under the requisite elements test, Plaintiff's predicate offenses do not "pertain to," nor are they "similar" to, antitrust violations, unfair trade practices, or restraints of trade, and Plaintiff is not excluded from the firearms prohibitions in Sections 922(g)(1) and 922(d)(1).

On the face of the criminal statutes that form the basis of Plaintiff's conviction, it is clear that none of them require an effect on competition or consumers. *See* Defs.' Mem. at 13-14 (providing detailed description of the elements of Plaintiff's predicate offenses).[7] Unable to dispute this fact, Plaintiff instead argues that, when criminal securities statutes require unlawful statements to be "material," the term "material" should be equated with "affecting consumers or competition." Compl, ¶ 18; Pl.'s Mem. at 18. Putting aside the substantive flaws in Plaintiff's reasoning, his approach fails at the outset for the simple reason that not all of his predicate offenses have a materiality requirement. Whereas Plaintiff's Complaint alleges that "[a]n element of each of [Plaintiff's] offenses is that the misstatements are material," Compl, ¶ 18, Plaintiff now concedes that one of his offenses – falsifying corporate records – actually "does not require proof of materiality." Pl.'s Mem. at 19. Rather, the "corporate records" statute provides only that issuers of registered securities must "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." *United States v. Reyes*, 577 F.3d 1069, 1079 (9th Cir. 2009) (quoting 15 U.S.C. § 78m(b)(2)(A)). Because Plaintiff's conviction for falsifying corporate records does not require a "material" misrepresentation, much less a direct effect upon competition or consumers, Plaintiff's conviction clearly falls outside the exclusion. And because this offense alone places

---

[7] For example, Plaintiff's securities fraud convictions required the Government to show "a (1) misleading (2) statement or omission (3) of a material fact (4) made with scienter." Defs.' Mem. at 13 (quoting *Smith*, 155 F.3d 1063).

Plaintiff squarely within the firearms prohibitions in 18 U.S.C. §§ 922(g)(1) and 922(d)(1), the Court need go no further.[8]

If the Court were nonetheless inclined to address Plaintiff's other convictions – for securities fraud, and making false statements to auditors – it should find that those offenses also fall outside the exclusion, as previously explained in Defendants' opening brief.  *See* Defs.' Mem. at 13-16.  Contrary to Plaintiff's assertions, the fact that these offenses (unlike Plaintiff's books and records violation) require the Government to show that Plaintiff's fraudulent statements were "material," does not in turn "require[] the Government to prove an effect on competition or consumers."  Pl.'s Mem. at 18.   The Supreme Court has held that materiality does not require proof "that disclosure of the omitted fact would have caused the reasonable investor to change his vote."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Rather, the Government need only show "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).[9]  This is not the same as requiring an effect on consumers or competition.  Indeed, when Congress wants to require an effect on consumers or competition as an element of a criminal

---

[8] Plaintiff attempts to avoid this finding by suggesting that the statute's "'reasonable detail' element serves similar ends as a materiality requirement."  Pl.'s Mem. at 19.  That is incorrect.  As Plaintiff notes, in the regulations implementing this statute, the SEC *expressly rejected a materiality requirement*.  *Id.* (citing Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act Release No. 15579, 1979 WL 173674, at *9 (Feb. 15, 1979)).  And, while the SEC noted that the absence of a materiality requirement resulted in greater protection for shareholders, this was precisely because the statute does not require *any* proof regarding the significance of a qualifying false statement to a reasonable investor.  Indeed, there is no requirement in the statute that the falsified corporate records could or would have any impact on investors at all.

[9] This standard is consistent with the fact that the materiality requirement was intended by Congress to weed out minor or inadvertent misstatements.  *See TSC Indus.*, 426 U.S. at 448 (explaining that the purpose of a materiality requirement is to weed out "insignificant omissions or misstatements").

statute, it does so explicitly.  *Compare* FTC Act, 15 U.S.C. § 45(n) (defining unfair trade practice as an "act or practice [that] *causes* or is likely to *cause substantial injury to consumers*") (emphasis added).[10]  In other words, whether a criminal misstatement is material is a matter of the degree, not the impact, of the statement.

### C.    The Legislative History Only Confirms that Plaintiff's Securities Violations are Not Covered by the Exclusion

Plaintiff, perhaps recognizing that the "elements test" does not resolve in his favor, instead attempts to divert attention by focusing instead on the legislative history of "securities regulation in this country."  Pl.'s Mem. at 11.  Plaintiff's broad survey of legislative history is beside the point, because any consideration of "legislative history remains secondary to an examination of the elements of the statute."  *Coleman*, 609 F.3d at 706; *see also Stanko*, 491 F.3d at 416-17 (explaining that the primary consideration is whether the Government had to prove an effect on competition or consumers as an element of the predicate offense, and that this is more significant than any inference from the legislative history of the criminal statute).  And, in any case, the history of both the firearm dispossession laws and the securities laws confirms that Congress did not intend the exclusion to apply to securities violations like those committed by Plaintiff.

First, there is no merit to Plaintiff's view that Congress intended the securities laws to be a mere extension of unfair trade practice offenses.  Pl.'s Mem. at 14.  As Plaintiff admits, the securities laws were enacted to address a distinct set of problems that were unique to the securities market and, thus, were *not* being addressed by the unfair trade practices laws.  *See* Pl.'s Mem. at 13 (citing Annual Report of the Federal Trade Commission for the Fiscal year Ended

---

[10] In light of these stark differences between the FTC Act and the securities laws, Plaintiff's attempt to draw parallels between the statutes, Pl.'s Mem. at 19, is misplaced.

June 30, 1919).  Congress confirmed the distinctiveness of the securities industry, and the needs

for particularized regulation thereof, when it passed the Securities Acts.  Rather than merely

amend the existing trade laws, Congress created a whole new body of separate laws for securities

regulation, complete with a new and distinct agency – the SEC – to govern them.  Securities Act

of 1933, 48 Stat. 74, 74; Securities Exchange Act of 1934, 48 Stat. 881.[11]

Second, the legislative history of the Gun Control Act and the exclusion support a finding

that Congress did not intend to exclude all "non-violent, commercial-type offenses," Pl.'s Mem.

at 10, and certainly not securities fraud.  Whereas, the predecessor statute, the Federal Firearms

Act, initially made it unlawful for a person convicted of a "crime of violence" to possess a

firearm, Congress subsequently deleted "crime of violence" and replaced it with "crime

punishable . . . for a term exceeding one year."  Act of Oct. 3, 1961, Pub. L. No. 87-342, 75 Stat.

757 ("non-violent crime amendment").  Plaintiff's suggestion that Congress intended only to

cover violent crimes cannot be reconciled with Congress's deliberate alteration of the text

through passage of the non-violent crime amendment.  Moreover, as Plaintiff acknowledges, the

bill resulting in the non-violent crime amendment was introduced, *inter alia*, to "'assist in the

fight against organized crime and racketeering,'" which are "activities closely associated with

criminal violence."  Pl.'s Mem. at 10 (quoting H.R. Rep. No. 87-1202, at 3068 (1961)).

Significantly, securities fraud is a type of "racketeering," as defined by the Racketeer Influenced

and Corrupt Organizations Act ("RICO").  *See* 18 U.S.C. § 1961.  And this is not happenstance.

---

[11] Because one of the general purposes of the securities laws is "to protect investors against manipulation of stock prices," and to "implement[] a 'philosophy of full disclosure,'" *Basic, Inc.*, 485 U.S. at 230 (quoting *Sante Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78 (1977)), it is not surprising that other securities offenses might meet those purposes by prohibiting direct fraud on consumers or competition.  *See, e.g.,* 15 U.S.C. § 80b-6 (making it unlawful for any investment adviser to defraud "any client or prospective client.").  But, no such laws are at issue in this case, where Plaintiff was convicted of making fraudulent statements about executive compensation in corporate disclosures.

Congress determined that securities fraud frequently has close ties to organized crime.  *See infra*

Part III.B (detailing the legislative history of RICO, and the connection between securities

violations and organized crime).

Finally, when Congress enacted the Gun Control Act in 1968, including the exclusion, it

made clear that it only intended to exclude "*certain* commercial-type crimes" from the firearms

disability, not *all* commercial-type crimes.  S. Rep. No. 90-1097, at 2202 (1968) (emphasis

added).  Even though the Securities Acts had been in place since 1933 and 1934 – and Congress

thus had over three decades of experience with the securities laws to consider – Congress chose

not to list "securities violations" alongside the enumerated business offenses that are listed in the

exclusion.  Had Congress intended to exclude all securities violations from the firearms

prohibitions it could, and would, have done so explicitly – as it plainly did for antitrust

violations, unfair trade practices, and restraints of trade – rather than concealing it in the

"pertaining to" and "similar" to language.[12]

---

[12] Plaintiff's argument that any ambiguity in the statute requires a ruling in his favor under the rule of lenity, *see* Pl.' Mem. at 16, is flawed for multiple reasons.  As a threshold matter, the scope of the statute is not ambiguous.  Indeed, courts of appeals have uniformly agreed that the clear meaning of 18 U.S.C. § 921(a)(20)(A) is that it excludes from the firearms prohibition only those offenses that require proof of an effect on competition and consumers.  *See supra* Part II.A.  But, even if the statute were ambiguous, Plaintiff misunderstands the reach of the rule.  Courts "do not resort to the rule of lenity where, as here, [they] can otherwise resolve the ambiguity of the statute."  *Stanko*, 491 F.3d at 414 n.5 (quoting *Bernitt v. Martinez*, 432 F.3d 868, 869 (8th Cir. 2005)); *see also United States v. Shabani*, 513 U.S. 10, 17 (1994) (requiring use of traditional tools of statutory construction to resolve ambiguities before resorting to the rule of lenity).

For similar reasons, Plaintiff's reliance on the doctrine of constitutional avoidance fares no better.  *See* Pl.'s Mem. at 16. The doctrine of constitutional avoidance only is invoked when a contrary interpretation of a statute would "raise serious constitutional problems."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).  The "constitutional avoidance" doctrine is meant only to be the "last refuge of many an interpretive lost cause. Statutes should be interpreted to avoid *serious* constitutional doubts, not to eliminate all possible contentions that the statute *might* be unconstitutional."  *Reno v. Flores*, 507 U.S. 292, 314 n.9 (1993) (internal citation omitted) (emphasis in original).  As explained *supra* in Part III, the firearms dispossession statutes are clearly constitutional as applied to Plaintiff, and thus there is no serious constitutional question here.  *See Schrader v. Holder*, 704 F.3d 980, 988 (D.C. Cir. 2013) (applying Section 922(g)(1) "creates no constitutional problem that we need to avoid").

III.   **SECTIONS 922(g)(1) AND 922(d)(1) ARE CONSITUTIONAL AS APPLIED TO PLAINTIFF**

A.   **Sections 922(g)(1) and 922(d)(1) do not Violate the Second Amendment**

In *District of Columbia v. Heller*, the Supreme Court addressed the "core" right of "law-abiding, responsible citizens to use arms in defense of hearth and home," and thus held that the District's ban on handgun possession in the home violated the Second Amendment.  554 U.S. 570, 634-35 (2008).  However, the *Heller* Court cautioned, *inter alia*, that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ."  *Id.* at 626-27.

In light of the fact that "there are certain types of firearms regulations that do not govern conduct within the scope of the [Second] Amendment," the D.C. Circuit – like other Courts of Appeals – has adopted a two-step test for Second Amendment challenges to firearms laws.  *See Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013).  First, the court must determine "whether the activity or offender subject to the challenged regulation falls outside the Second Amendment's protection."  *Id.* at 988-89 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011)).  Second, if the court determines that Plaintiff falls within the category of "law-abiding, responsible citizens" entitled to the protections of the Second Amendment, *Heller*, 554 U.S. at 635, only then must the court "determine whether the provision passes muster under the appropriate level of constitutional scrutiny."  *Schrader*, 704 F.3d at 989 (quoting *Heller*, 670 F.3d at 1252).  Plaintiff's Second Amendment claims fail at each step.

1.   Plaintiff's Felony Conviction Categorically Excludes Him from the Protection of the Second Amendment

Plaintiff was convicted of nine felony counts, crimes that the sentencing court deemed so

serious as to warrant eighteen months in prison and a $15 million fine.  Notwithstanding the fact that Plaintiff intentionally defrauded Brocade's shareholders, thereby demonstrating that he is neither "responsible" nor "law-abiding," Plaintiff nonetheless claims to be entitled to the protection of the Second Amendment because "there is no longstanding tradition of disarming *nonviolent* felons like him."  Pl.'s Mem. at 30 (emphasis in original).  Plaintiff is incorrect.

Tellingly, Plaintiff fails to address the abundant case law on dispossession of felons, which is discussed in Defendants' opening brief, Defs.' Mem. at 18-19.  As explained therein, the majority of courts to consider this issue, including this Court, have held that convicted felons, whether their crimes were violent or not, fall outside the protections of the Second Amendment. *See Medina v. Sessions*, Case No. 15-cv-01718 (CRC), 2017 WL 3912981, at *4 (D.D.C. Sept. 6, 2017) (holding that plaintiff with fraud conviction, "like any convicted felon" falls outside protection of the Second Amendment) (citing cases from the Fourth, Fifth, Ninth, Tenth, Eleventh Circuits).[13]  Nor have the Third, Seventh, and Eighth Circuits, while allowing as-applied Second Amendment challenges in theory, permitted a successful challenge by a felon.[14] Even the Third Circuit – perhaps the most generous in allowing as-applied challenges to Section 922(g)(1) – has explained that a convicted felon must face an "extraordinarily high – and perhaps even insurmountable" burden in raising a Second Amendment challenge.  *Binderup v. Attorney*

---

[13] *See Hamilton v. Pallozzi*, 848 F.3d 614, 623 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 500 (2017); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) ("Prior to *Heller*, this circuit had already recognized an individual right to bear arms, and had determined that criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate that right."); *United States v. Vongxay*, 594 F.3d 1111, 1116 (9th Cir. 2010); *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010).

[14] *See United States v. Williams*, 616 F.3d 685, 693 (7th Cir. 2010); *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014).

*Gen. U.S.*, 836 F.3d 336, 353 n.6 (3d Cir. 2016) (plurality op. of Ambro, J. for three judges).[15]

In other words, Courts of Appeals have been consistent in finding that convicted felons – violent

or not – remain categorically different from the law-abiding, responsible citizens *Heller*

identified as the heartland for Second Amendment protections.

Suggesting this Court disregard this unanimous body of precedent, Plaintiff argues that

he should be deemed protected by the Second Amendment, contending that only felons who

committed *violent* crimes would historically have forfeited their right to possess firearms.  Pl.'s

Mem. at 31.  Plaintiff is incorrect.  A key ratification proposal, which *Heller* identified as a

"highly influential" "precursor" to the Second Amendment, 554 U.S. at 604, provided that "no

law shall be passed for disarming the people or any of them "*unless for crimes committed*, or real

danger of public injury."  Bernard Schwartz, 2 *the Bill of Rights: A Documentary History* 662,

665 (1971) (hereinafter "Schwartz") (emphasis added).[16]  Thus, the Second Amendment

incorporates an implicit "exclusion from the individual right to keep and bear arms" for those

convicted of felony charges because this limitation was implicitly "understood" as obvious at the

time of ratification.  Stephen P. Halbrook, *the Founders' Second Amendment* 273 (2008).[17]

---

[15] Relying on *Binderup*, Plaintiff attempts to make much of the fact that the firearms prohibitions, by encompassing crimes "punishable by imprisonment for a term exceeding one year," may apply to less serious offenses (*i.e.*, misdemeanors).  *See* Pl.'s Mem. at 31-32.  But, any such concern has no bearing on this case, in which Plaintiff was convicted of nine counts of violating federal securities laws – which are felonies under any definition, and which were deemed so serious that Plaintiff was sentenced to eighteen months in prison and to pay a $15 million fine.

[16] Plaintiff attempts to dismiss this key historical resource, by contending that "the 'crimes committed' language in the Pennsylvania proposal *must* refer to some subset of crimes, and the 'real danger of public injury' language tells us what that subset is: crimes indicating a tendency to be dangerous or violent."  Pl.'s Mem. at 38 (emphasis added).  But Plaintiff fails to offer any explanation beyond this conclusory statement.  And his theory fails on its face because the Second Amendment precursor excluded persons who committed crimes "*or*" those who posed a real danger of public injury.  Thus, the limitation clearly addresses to two independent categories.

[17] Plaintiff attempts to highlight, instead, proposals from two other ratifying conventions, neither of which changes the analysis here.  Pl.'s Mem. at 36-37.  The first is a proposal from the Massachusetts

Moreover, the purpose of the Second Amendment was in part to arm a "virtuous citizen[ry]" to protect society against criminals, and other threats, not to prevent the "disarming of unvirtuous citizens." *Id.* at 1118 (citing Donald B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983)); *see also United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (discussing the "common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens").[18]  And excluding convicted felons from the right to bear arms is "consistent with the explicit purpose [set forth in] the Second Amendment to maintain 'the security of a free State.'" *Vongxay*, 594 F.3d 1111, 1117 (2010).

In any event, the Court here need not determine the outer bounds of the exclusion of criminals from Second Amendment protection.  On its face, Plaintiff's crime is a serious one, and "persons who have committed serious crimes forfeit[] the right to possess firearms much the way they forfeit other civil liberties, including fundamental constitutional rights."  *Medina*, 2017 WL 3912981, at *6 (quoting *Binderup*, 836 F.3d at 349); *accord Hamilton*, 848 F.3d at 626 ("Where the sovereign has labeled the crime a felony, it represents the sovereign's determination

---

ratifying convention, which presented a long list of proposed rights, including the right of "peaceable citizens [to] keep their own arms."  Schwartz, 681.  But, the Massachusetts convention rejected this proposal in its entirety.  *Id.*  And even if it still were relevant, the term "peaceable" is best understood to cover persons who have not engaged in serious unlawful activity.  As Plaintiff points out, "peaceable" could mean, *inter alia*, "free from tumult," Pl.'s Mem. at 36-37, a definition that surely encompasses Plaintiff's conduct to upend a public company and defraud its shareholders.  The second proposal Plaintiff notes is from the New Hampshire ratifying convention, which proposed a right to bear arms unless a citizen "ha[s] been in Actual Rebellion."  *Id.* at 37.  But this narrow exception provides little information about the broader exclusion proper under the Second Amendment as actually adopted, given that *Heller* has made clear that the appropriate restrictions on Second Amendment rights include "longstanding prohibitions on possession of firearms by felons," not just those in "actual rebellion."  554 U.S. at 626.

[18] Plaintiff rejects the cases and scholarship adopting a "virtuous citizen[ry]" reasoning out of hand, but provides no case or evidence to the contrary.  Pl.s' Mem. at 33.  Plaintiff seems merely to present his personal opinion that he finds the historical sources on this point unconvincing, *id.*, notwithstanding that the fact that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry."  *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010).  *Heller* itself cautioned against reliance on the Second Amendment to undercut "longstanding prohibitions on the possession of firearms by felons."  554 U.S. at 626-27.

that the crime reflects grave misjudgment and maladjustment."); *id.* at 627 ("Theft, fraud, and forgery are not merely errors in filling out a form or some regulatory misdemeanor offense; these are significant offenses reflecting disrespect for the law.").  Indeed, felonies and/or fraud have been deemed serious crimes for centuries.  *See Hamilton v. Pallozzi*, 165 F. Supp. 3d 315, 326 (D. Md. 2016) ("Although the particular statutes that Plaintiff violated are directed toward misappropriation of credit cards, the underlying misconduct is the kind of misconduct that the law has proscribed from time immemorial.  Plaintiff's crimes are not technical or regulatory offenses:  they are black-letter *mala in se* felonies reflecting grave misjudgment and maladjustment."), *aff'd*, 848 F.3d 614 (4th Cir. 2017); *see also United States v. Phillips*, 827 F.3d 1171, 1176 (9th Cir. 2016) ("[W]e are hard pressed to conclude that a crime that has always been a federal felony cannot serve as the basis of a felon firearm ban, simply because its *actus reas* may appear innocuous.").

Nor is it correct that "there were no common-law antecedents to modern felony dispossession laws," Pl.'s Mem. at 35, as Plaintiff contends.  Neither a felon, nor even his heirs through him, could own property at common law.  *See* 3 William S. Holdsworth, A History of English Law 69 (3d ed. 1923); *see also* Vernon M. Winters, *Criminal RICO Forfeitures and the Eighth Amendment 'Rough' Justice is Not Enough*, 14 Hastings Const. L.Q. 451, 457 (1987) ("A felon who had broken the social contract no longer had any right to social advantages, including transfer of property . . . .").  It is hardly a reach to conclude that felons likewise would have been precluded from possessing a firearm.  *See generally Binderup*, 836 F.3d at 349 ("The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era.").

Accordingly, Plaintiff falls within a class of persons who historically has been, and continues to be, deemed outside the protections of the Second Amendment.

> 2.    Sections 922(g)(1) and 922(d)(1) are Constitutional as Applied to Plaintiff because they Satisfy Intermediate Scrutiny

Even assuming *arguendo* that Plaintiff could assert a right under the Second Amendment, his claim still would fail at the second step of the analysis.  Under D.C. Circuit precedent, intermediate scrutiny is the appropriate standard for a Second Amendment challenge to Section 922(g)(1) by a person or persons who are not "law-abiding, responsible citizens."  *See Schrader*, 704 F.3d 989.  To satisfy intermediate scrutiny, "a statutory classification must be substantially related to an important governmental objective."  *Id.*; *see also Clark v. Jeter*, 486 U.S. 456, 461 (1988); *Heller*, 670 F.3d at 1258.  "[T]he fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect."  *Schrader*, 704 F.3d at 990.  And the D.C. Circuit has made clear that, while it subjects the law to "meaningful judicial review," it also "accord[s] substantial deference to the predictive judgments" of the legislature.  *Heller II*, 670 F.3d at 1259.

Plaintiff does not, and cannot, dispute that the government has an "obviously important" interest in preventing gun violence.  *See Schrader*, 704 F.3d at 989-90.  Nor is there any question that the principal objective of 18 U.S.C. § 922(g)(1) is "to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."  *Barrett v. United States*, 423 U.S. 212, 218 (1976); *see also Small v. United States*, 544 U.S. 385, 393-94 (2005) (Congress enacted section 922(g)(1) to "keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society"); *United States v. Daugherty*, 264 F.3d 513, 516 n.7 (5th Cir. 2001) ("Congress'[s] intent in enacting [§ 922(g)] . . . was to keep firearms out of the hands of presumptively risky people") (quoting

*Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n. 6 (1983)); *Burrell v. United States*, 384 F.3d 22, 27 (2d Cir. 2004) (Section 922(g)(1) "was one of several measures enacted by Congress to 'prohibit[] categories of presumptively dangerous persons' from possessing firearms") (quoting *Lewis v. United States*, 445 U.S. 55, 64 (1980)).  Indeed, Congress's exclusion of all felons was the result of thoughtful deliberation and decades of experience.  *See United States v. Laurent*, 861 F. Supp. 2d 71, 105 (E.D.N.Y. 2011) (explaining that Congress enacted the non-violent crime amendment to Section 922(g)(1) because "[a]fter three decades of experience, it saw the need to expand the prohibition to all indictees.").

Plaintiff contends that, because he was convicted of a non-violent crime, Defendants cannot satisfy intermediate scrutiny by showing a substantial relationship between their objective of preventing violent crime and prohibiting him from possessing a firearm.  Pl.'s Mem. at 43. (arguing that the statutes are overbroad because they apply to both violent and non-violent felons).  Plaintiff fails to recognize that Congress is empowered to establish certain "categorical disqualifications" and "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons." *Skoien*, 614 F.3d at 641; *see also Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015 ("Intermediate scrutiny does not require a perfect fit between a rule's objectives and the circumstances of each individual subject to the rule."); *United States v. Elkins*, 495 F. App'x 330, 332 (4th Cir. 2012).  Such "bright line" rules serve the public interest: the "categorical approach used in §§ 922(g)(1) [and 922(d)(1)] allows for uniform application and ease of administration as well as further deterrence of the commission of another crime." *Kanter v. Sessions*, Case No. 16-c-1121, 2017 WL 6731496, at *3-4 (E.D. Wis. Dec. 29, 2017).  Moreover, even if there might be some hypothetical nonviolent felony conviction for which application of Sections 922(g)(1) and 922(d)(1) were not necessary

to serve the public interest, that hypothetical is not at issue here, where Plaintiff was convicted of

not one, but nine felony counts and served eighteen months in prison.  In this context,

"[i]rrespective of whether [the] offense[s] w[ere] violent in nature, [Plaintiff] has shown manifest

disregard for the rights of others. He may not justly complain of the limitation on his liberty

when his possession of firearms would otherwise threaten the security of his fellow citizens."  *Id.*

(citing *United States v. Emerson*, 270 F.3d 203, 260 (5th Cir. 2001)); *see also Yancey*, 621 F.3d

at 685 ("Most felons are nonviolent, but someone with a felony conviction on his record is more

likely than a nonfelon to engage in illegal and violent gun use").[19]

Accordingly, 18 U.S.C. §§ 922(g)(1) and 922(d)(1) do not violate the Second

Amendment as it applies to Plaintiff, a convicted felon.

### B.   Plaintiff's Equal Protection Claims Fails as a Matter of Law

Plaintiff claims that Sections 922(g)(1) and 922(d)(1) violate his equal protection rights

under the Fifth Amendment because they treat him – due to his status as a convicted securities

felon – differently from other white-collar criminals whose predicate offenses fall within the

exclusion from the firearms dispossession laws.  Pl.'s Mem. at 24-28.  Plaintiff's equal

protection claims fail because the distinction drawn by Congress is rationally related to the

legitimate interest in regulating firearms.

Federal statutes challenged for denial of equal protection are entitled to deferential

---

[19] Contrary to Plaintiff's view, *Heller II* and *Heller III* do not require that the government provide an empirical study that "distinguish[es] *among* felons."  Pl.'s Mem. at 44.  The Supreme Court made clear that the government may satisfy intermediate scrutiny by relying "solely on history, consensus, and simple common sense."  *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (quoting *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (citing *Burson v. Freeman*, 504 U.S. 191, 211 (1992).  In any event, while Plaintiff may disagree with the import of Defendants' empirical evidence on this matter, *see* Pl.'s Mem. at 28, courts that have considered these same studies have found them compelling.  *See Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008) (relying on study that shows "a large percentage of the crimes nonviolent recidivists later commit are violent.").

rational basis review if their "legislative classification or distinction 'neither burdens a fundamental right nor targets a suspect class.'" *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)).  As discussed *supra* in Part III.A, Sections 922(g)(1) and 922(d)(1) do not burden a fundamental right of Plaintiff, because his felony conviction categorically excludes him from the class of "law abiding-responsible citizens" who are entitled to Second Amendment protections.  Nor does Plaintiff allege that he is a member of any suspect class.  Accordingly, Plaintiff's equal protection claims are subject to rational basis review.[20]

Under rational-basis review, a classification in a statute "bear[s] a strong presumption of validity." *FCC v. Beach Comm., Inc.*, 508 U.S. 307, 314 (1993).  To meet rational basis review "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation and unsupported by evidence or empirical data." *Id.*  Moreover, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. *Id.*  In sum, "[w]here there are 'plausible reasons' for Congress' action, 'our inquiry is at an end.'" *Id.* at 313-14.

When Congress enacted the Gun Control Act of 1968, including 18 U.S.C. §§ 922(g)(1), 922(d)(1), and 921(a)(20)(A), its purpose was "to keep firearms out of the hands of potentially irresponsible persons, including convicted felons." *Kruckel*, 1993 WL 765648, at *18 (citing

---

[20] Plaintiff does not contend that he is a member of any suspect class.  He, thus, concedes that, if he is not protected by the Second Amendment, then the firearms prohibitions do not burden any fundamental right and rational basis review is the proper standard for his equal protection claims.  Pl.'s Mem. at 24.  However, even assuming *arguendo*, that Plaintiff were among the class of "law abiding-responsible citizens" who are entitled to Second Amendment protections, the firearms statutes would satisfy the standard of intermediate scrutiny as applied to Plaintiff under the Fifth Amendment, for the same reasons the statutes satisfy intermediate scrutiny under the Second Amendment. *See supra* Part II.A.2 (analyzing Plaintiff's Second Amendment claims under intermediate scrutiny).

*Barrett*, 423 U.S. at 220-21).  In enacting the exclusion set forth in 18 U.S.C. § 921(a)(20)(A),

Congress plausibly could determine that persons convicted of certain types of offenses –

antitrust, unfair trade, restraint of trade – "were less likely as a group than other categories of

convicted felons to abuse the privilege of possessing a firearm.  *Id.*[21]

In light of Congress's objectives and purpose, it was not irrational for it to conclude that

securities felons are more likely to use firearms irresponsibly than antitrust or trade violators.

Unlike trade and antitrust, securities fraud has been tied to other offenses that threaten public

safety.[22]  In perhaps the starkest example, the connection between securities violations and other

dangerous offenses is demonstrated by the inclusion of securities fraud in the Racketeer

Influenced and Corrupt Organizations Act ("RICO").  Sections 1962(b) and (c) of RICO prohibit

conducting the affairs of an enterprise, as well as acquiring an interest in an enterprise, through a

"pattern of racketeering activity."  The term "racketeering activity" is defined to include, *inter

alia,* violent crimes (*e.g.,* murder, kidnapping), pornography, narcotics trafficking, gambling,

embezzlement, bribery, *securities fraud*, mail fraud and wire fraud.  *See* 18 U.S.C. § 1961.  By

contrast, the definition of "racketeering" does not include antitrust or trade violations.

Securities fraud was included in RICO because organized crime had become frequently

involved in securities thefts.  *See* S. Rep. No. 91-617, 77 (1969) ("It is most disturbing . . . to

learn that organized crime has begun to penetrate securities firms and the Stock Exchange

---

[21] Plaintiff takes issue with the strength of Defendants' empirical evidence supporting this basis for Congress's determination.  Pl.'s Mem. at 26.  But, the fact that there is room for disagreement about the efficacy of a Congressional classification does not render it irrational.  *See FCC*, 508 U.S. at 314 ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.").

[22] Also unlike securities fraud violations, antitrust-type violations were excluded because Congress "noted that antitrust-type violations [were] not felonies under Federal law."  S. Rep. No. 1866, at 77 (1966).

itself."). At the time RICO was being considered, there were "over 30 pending cases . . .

involving thefts of securities from brokerage houses [and] [c]lose associates and relatives of La

Cosa Nostra figures [we]re known to be involved in at least 11 of these cases." *Id.* In

recognition of the major role played by organized crime in disposal of stolen securities, Congress

held hearings specifically to explore the subject. *See* Hearings Before the Permanent Subcomm.

on Investigations of the Senate Comm. on Government Operations, 92d Cong., 1st Sess. 1-2

(1071). During those hearings, Congress noted that criminal involvement in areas of securities

fraud were not limited to market manipulation and the sale of stolen securities. *Id.* at 1250.

Against this backdrop, Congress rationally could determine that securities felons are more likely

than antitrust and trade practice violators to commit dangerous offenses. In fact, the hearings on

RICO occurred just one year after the Gun Control Act of 1968, which included the exclusion. It

is, thus, reasonable to infer that Congress would have been aware of the connection between

organized crime and securities fraud at the time when it decided not to exclude securities

violations from the firearms dispossession laws.

Finally, the reasoning in a similar case denying another white-collar felon's equal

protection claims is instructive here. In *United States v. Kruckel*, a district court considered the

plaintiff's prior conviction for tax evasion. 1993 WL 765648 (D.N.J. Aug. 13, 1993). Just as

Plaintiff does here, Kruckel argued that excluding some business felons, but not tax felons, was

an "unconstitutionally irrational classification." *Id* at *18. The *Kruckel* Court held that

"Congress could have rationally assumed that on the whole, the class of persons convicted of tax

offenses are more likely than the class of antitrust and trade practices felons to also have

committed other, more serious, offenses, such as ones involving drugs, racketeering, or extortion,

which led to their efforts to evade taxation." *Id.* The Court explained that "Congress could

logically have assumed that the total spectrum of criminal activity engaged in by those persons ultimately charged and convicted under the tax laws is in general broader and potentially more antisocial or dangerous than that engaged in by persons convicted of the business related offenses excluded by § 921(a)(2)(A)." *Id.*  The reasoning from *Kruckel* applies ten-fold in the instant case.  Here, the predicate offense at issue (securities fraud) not only could lead to racketeering and other dangerous activities associated with organized crime, but has actually been deemed by Congress to *constitute* a form of racketeering in and of itself.

Accordingly, Congress's decision to preclude securities felons from possession of firearms, while allowing those who committed other types of business crimes to possess firearms, is rationally related to responsible limitations on firearms possession, and Plaintiff's equal protection claims should be dismissed.

## **CONCLUSION**

Accordingly, for the foregoing reasons and for the reasons stated in Defendants' Memorandum in Support of their Motion to Dismiss, this case should be dismissed with prejudice.

DATED this 1st day of February 2018.


Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
United States Department of Justice, Civil Division

JOHN R. TYLER
Assistant Branch D10irector
Federal Programs Branch

  /s/ Emily B. Nestler
EMILY B. NESTLER (D.C. Bar No. 973886)
Trial Attorney
United States Department of Justice, Civil Division,
Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Tel: (202) 616-8489
Fax: (202) 616-8470
emily.b.nestler@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of February 2018, I served the foregoing document on all counsel of record by filing it via CM/ECF in accordance with the Local Rules.

Executed on February 1, 2018, in Washington, D.C.

_/s/ Emily B. Nestler_____
Emily B. Nestler