## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GREGORY L. REYES**

     **Plaintiff,**

      **v.**

**JEFF SESSIONS, in his official capacity as Attorney General of the United States, et al.,**

     **Defendants.**

**Civil Action No. 17-1643 (JDB)**

## <u>MEMORANDUM OPINION</u>

Before the Court is [10] the government's motion to dismiss the as-applied statutory and constitutional challenges brought by plaintiff Gregory Reyes to certain provisions of the federal criminal prohibition on possession of firearms by felons. Eight years ago, Reyes was convicted of violations of the Securities Exchange Act of 1934 (the "Exchange Act") and sentenced to eighteen months in prison. He now wishes to obtain a firearm but has been prevented from doing so by 18 U.S.C. § 922(d)(1) and (g)(1), which prohibit the transfer of firearms to and possession of firearms by individuals convicted of a "crime punishable by imprisonment for a term exceeding one year." This category of crimes, however, is statutorily defined to exclude "offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20)(A). Because the Court finds that Reyes's convictions fall within this exception, the Court will deny the government's motion to dismiss.

## BACKGROUND

**I.    STATUTORY BACKGROUND**

Enacted in 1938, the first federal firearm disqualification statute initially prohibited the sale of firearms to and possession of firearms by felons and misdemeanants convicted of a "crime of violence," which was statutorily defined to include offenses such as murder, rape, mayhem, and burglary.  See Federal Firearms Act, Pub. L. No. 75-785, §§ 1(6), 2(d), (f), 52 Stat. 1250, 1250–51 (1938).  In 1961, Congress expanded the scope of these prohibitions to sweep in non-violent criminals, amending the prohibited class to include any person convicted of a "crime punishable by imprisonment for a term exceeding one year."  See An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757, 757 (1961).

Seven years later, Congress passed the Gun Control Act and again redefined the class of individuals disqualified from possessing firearms.  See Pub. L. No. 90-618, 82 Stat. 1213 (1968).  The Act, as amended and codified in part at 18 U.S.C. § 922(g)(1), prohibits any individual who has been convicted of "a crime punishable by imprisonment for a term exceeding one year" from transporting or receiving "any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  A corollary provision, 18 U.S.C. § 922(d)(1), makes it unlawful "to sell or otherwise dispose of any firearm or ammunition to any person" who "has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year[.]"

Under the Gun Control Act, however, not all individuals convicted of a felony are disqualified from acquiring or possessing firearms.  The term "crime punishable by imprisonment for a term exceeding one year" is defined statutorily by 18 U.S.C. § 921(a)(20)(A) to exclude "certain commercial-type crimes," S. Rep. No. 90-1097, at 112–13 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2202.  Specifically, the Gun Control Act provided that the term did not include

2

"Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary [of the Treasury] may by regulation designate."  Pub. L. No. 90-618, § 921(a)(20)(A), 82 Stat. 1213, 1216 (1968).  Ultimately, the Secretary never designated any "similar offenses" as excluded, and in 1986 Congress eliminated from the definition the phrase, "as the Secretary may by regulation designate."  See Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449, 449 (1986).  All "other similar offenses relating to the regulation of business practices" were thus excluded from the definition of a "crime punishable by imprisonment for a term exceeding one year," and it was left to the courts to identify which offenses fell within this "business practices" exception.  See S. Rep. No. 98-583, at 7 (1984) (noting that the Firearm Owners' Protection Act "makes the court, rather than the Secretary, the final arbiter as to what constitutes a 'similar offense relating to the regulation of business practices'").

## II.    FACTUAL BACKGROUND

Eight years ago, Reyes came within the potential ambit of the felon-in-possession statute when he was convicted of certain offenses punishable by more than one year of imprisonment. From 1998 to 2005, Reyes was the Chief Executive Officer of Brocade Communications Systems, Inc. ("Brocade"), a publicly traded company.  United States v. Reyes, 660 F.3d 454, 459–60 (9th Cir. 2011).  The company offered stock options to new and existing employees that gave them the right to purchase Brocade stock at a fixed (strike) price on or after a particular date.  Id. at 459. Brocade backdated these options, recording the grant date retroactively so that the strike price was below the stock's then-current market value and thus was instantly profitable to the option-holder. Id.  Although this practice was not illegal in and of itself, the company was required to record these employment benefits as non-cash compensation expenses in the company's financial records.  Id.

3

But Brocade failed to account for these expenses, and Reyes was subsequently charged with various violations of the Exchange Act.  Id.

In 2010, Reyes was convicted of (1) securities fraud and making false filings with the Securities and Exchange Commission ("SEC") in violation of 15 U.S.C. §§ 78j(b) and 78(ff), and 17 C.F.R. § 240.10b–5; (2) falsifying corporate books and records in violation of 15 U.S.C. §§ 78m(b)(2)(A) and 78ff, and 17 C.F.R. § 240.13b2–1; and (3) making false statements to auditors in violation of 15 U.S.C. § 78ff and 17 C.F.R. § 240.13b2–2.  Id.  Each of these crimes carries a maximum prison sentence of twenty years.  15 U.S.C. § 78ff.  Reyes ultimately was sentenced to eighteen months in prison, two years of supervised release, and was fined $15 million.  Reyes, 660 F.3d at 460.

Reyes now wishes "to acquire and possess . . . firearms for defense of himself and his family and for hunting."  Compl. [ECF No. 1] ¶ 28.  Although his right to possess a firearm has been restored under the laws of his home state of Montana, he alleges that the government's interpretation and application of the federal felon-in-possession statute effectively prevents him from purchasing a firearm.  Id. ¶¶ 27, 29–34.  Because the government instructs firearms dealers not to sell to anyone who has "been convicted in any court of a felony, or any other crime for which the judge could have imprisoned [him] for more than one year," Reyes asserts that sellers are unable to provide him with a firearm.  Compl. ¶¶ 25–26, 31 (quoting U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), Firearms Transaction Record: ATF E-Form 4473 (Oct. 2016)).  Indeed, Reyes alleges that two merchants specifically informed him that they would be unwilling to make such a sale to him due to his felony convictions.  Id. ¶¶ 31–32.  Moreover, even if Reyes could obtain a firearm from a licensed federal firearms dealer or a private party, he asserts that he has refrained from attempting to do so because he believes the

government would subject him to criminal penalties under 18 U.S.C. § 922(g)(1).  Id. ¶¶ 30, 32–34.  Reyes thus claims he is effectively barred from acquiring a firearm.

### III.   PROCEDURAL HISTORY

In August 2017, Reyes filed the instant action bringing as-applied statutory and constitutional challenges to 18 U.S.C. § 922(d)(1) and (g)(1).  He first claims that he is statutorily exempted from § 922(d)(1) and (g)(1) because his convictions constitute business practices offenses excluded under § 921(a)(2)(A) (Count I).  Compl. ¶¶ 4, 36–37.  In the alternative, he asserts two claims under the Equal Protection Clause of the Fifth Amendment, alleging that the statute creates two impermissible distinctions: first, between federal offenders convicted, like him, of securities and accounting offenses who are barred from possessing firearms and federal offenders convicted of "business practices" offenses who are excepted from the felon-in-possession statute (Count II), id. ¶¶ 5, 39–41; and second, between citizens convicted of non-violent crimes who do not "pose[] any greater risk to public safety[] than a typical law-abiding citizen" but are disqualified from firearm possession and other citizens not subject to § 922(d)(1) and (g)(1) (Count III), id. ¶¶ 6, 43–45.  Reyes also claims in the alternative that the firearms disability fails heightened judicial scrutiny under the Second Amendment because he was convicted of non-violent offenses (Count IV).  Id. ¶¶ 7, 47–49.  For all counts, he seeks declaratory and injunctive relief barring the government from enforcing § 922(d)(1) and (g)(1) against him based on his 2010 convictions.  Id. at 14–15.

The government now moves to dismiss Reyes's claims.  See Defs.' Mot. to Dismiss ("Gov't Mot.") [ECF No. 10].  It argues that: (1) Reyes does not have Article III standing to challenge § 922(d)(1), see id. at 9–10; (2) his predicate convictions do not fall within the statutory exception to the firearms disability, see id. at 10–16; (3) Reyes is not within the scope of the Second

Amendment's protections because he was convicted of serious crimes and, even if the Second Amendment does apply, the statutory restrictions satisfy intermediate scrutiny, see id. at 16–26; and (4) his Equal Protection claims fail because the felony classification, including its exception for certain business practices offenses, satisfies both rational basis and heightened scrutiny, see id. at 26–28.  Also pending before the Court is Reyes's motion for leave to file a surreply addressing one of the government's Equal Protection arguments.  See Pl's Mot. to File a Surreply in Opp'n to Defs.' Mot. to Dismiss [ECF No. 16].  The government's motion to dismiss and Reyes's related motion for leave to file a surreply are now fully briefed and ripe for decision.

## LEGAL STANDARD

Defendants have moved to dismiss this case for failure to state a claim under Rule 12(b)(6) and, in part, for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  To survive a motion to dismiss for lack of standing under Rule 12(b)(1), a plaintiff must demonstrate that he has standing by pleading facts that, taken as true, render it plausible that the Court has subject-matter jurisdiction.  See Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015).  For motions brought under both Rules, the Court must accept as true all facts stated in the complaint, but it is not bound to "legal conclusion[s] couched as . . . factual allegation[s]."  Iqbal, 556 U.S. at 678.

## **DISCUSSION**

I.     **REYES HAS STANDING TO CHALLENGE § 922(D)(1)**

As a preliminary matter, the Court addresses the government's assertion that Reyes does not have standing to challenge 18 U.S.C. § 922(d)(1).  To establish standing, a plaintiff must allege three elements: (1) an "injury in fact," which is "concrete and particularized" and "actual or imminent"; (2) that the injury is fairly traceable to the challenged provision and (3) that the injury is likely to be redressable by the court.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

Reyes alleges that § 922(g)(1), which prohibits firearm possession by certain felons, and § 922(d)(1), which prohibits the sale and transfer of firearms to certain felons, together prevent him from acquiring a firearm.  The government disputes only whether Reyes has suffered a cognizable injury from the application of § 922(d)(1), arguing that only an individual transferring or selling a firearm—not a would-be purchaser or recipient—suffers a potential injury in fact from the application of the seller provision.  See Gov't Mot. at 9–10.  Because Reyes does not allege that he wishes to transfer or sell a firearm, the government contends that he cannot satisfy the first element of standing—an injury in fact—to assert his § 922(d)(1) claims.

But the government's position is inconsistent with both common sense and longstanding precedent.  Even if Reyes successfully challenged § 922(g)(1) and was deemed able lawfully to possess a firearm, it would be a hollow victory if others were legally prohibited from providing him with one.  As courts have long recognized, restrictions on providers can cause cognizable injuries to would-be recipients who are prevented from accessing goods and services in which they have a legally protected interest.  See, e.g., Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 757 (1976) (finding prospective consumers had standing to bring constitutional challenge to restrictions on drug advertisers); Roe v. Wade, 410 U.S. 113, 124–25

(1973) (holding pregnant woman had standing to challenge statute prohibiting the administration of abortions).  Reyes need not allege that he is prevented from selling a firearm because he alleges a different, concrete and actual injury caused by § 922(d)(1): the injury of not being able to purchase or obtain firearms.

Well-settled law supports this finding.  In Dearth v. Holder, for instance, the D.C. Circuit held that a would-be purchaser suffered a "sufficiently real and immediate" injury from two provisions of § 922 that prohibited the sale of firearms to and purchase of firearms by individuals residing outside the United States.  641 F.3d 499, 500, 503 (D.C. Cir. 2011).  Noting that the two laws "together make it impossible . . . lawfully to purchase a firearm," the D.C. Circuit found that a would-be purchaser of firearms had standing to challenge the provisions because they "thwarted [his] best efforts to acquire a firearm."  Id. at 500, 502; see also Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 700 F.3d 185, 191–92 (5th Cir. 2012) ("[B]y prohibiting [firearm licensees] from selling handguns to 18-to-20-year-olds, [18 U.S.C. § 922(b)(1) and (c)(1)] cause those persons a concrete, particularized injury—i.e. the injury of not being able to purchase handguns from [firearm licensees]."); cf. Ezell v. City of Chicago, 651 F.3d 684, 689–90, 695 (7th Cir. 2011) (noting that city ordinance banning firing-ranges "interferes with [the gun owners'] right to possess firearms for self-defense," which "easily support[s] Article III standing" when range training was a prerequisite to gun ownership).  Like the plaintiff in Dearth, Reyes alleges that he is injured by provisions of § 922 which together prevent him from acquiring a firearm.[1]  Hence, both common sense standing principles and binding precedent compel the

---

[1] The government attempts to distinguish Dearth by highlighting the court's analysis of whether a would-be purchaser must first be denied a firearm permit to be injured.  See Defs.' Reply in Supp. of Mot. to Dismiss ("Gov't's Reply") [ECF No. 15] at 3 n.1.  But the D.C. Circuit ultimately held that a permit denial was not required because the would-be purchaser's injury stemmed from "'statutory classifications' that bar him from acquiring a firearm."  Dearth, 641 F.3d at 502 (citation omitted).  So too here, where sellers are prevented from transferring a firearm to Reyes because of his felon status.

Court to conclude that Reyes has pleaded sufficient facts to establish an injury in fact for purposes of standing to challenge § 922(d)(1).[2]

## II.   COUNT I: STATUTORY EXCLUSION UNDER § 921(A)(20)(A)

Having found that Reyes has standing to challenge 18 U.S.C. § 922(d)(1), the Court must now determine whether the prohibitions in 18 U.S.C. § 922(d)(1) and (g)(1) apply to exclude him from procuring or possessing a firearm.  Reyes alleges that he falls within the "business practices" exception to the definition of "a crime punishable by imprisonment for a term exceeding one year" because he was convicted of "offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices."  Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") [ECF No. 13] at 8 (quoting 18 U.S.C. § 921(a)(20)(A)).   More specifically, Reyes contends that each of his predicate offenses—(1) securities fraud, (2) falsifying corporate books and records, and (3) making false statements to auditors—"pertain to" or "are similar to" unfair trade practices and hence are excluded from the class of convictions that trigger application of § 922(g)(1) and (d)(1).  See Pl.'s Opp'n at 11.

The government argues that the business practices exception only encompasses those offenses that possess the same quality that, it asserts, unites the enumerated offenses: proof of direct economic harm to competition or consumers.  Gov't Mot. at 11.  To determine whether a

---

[2] Given the D.C. Circuit's clear holding in Dearth, this Court need not consider opinions from courts in other Circuits.  In any event, the government misreads two of the cases it cites in opposition.  See Gov't Mot. at 10 (first citing Lane v. Holder, 703 F.3d 668, 672 (4th Cir. 2012), then citing Bezet v. United States, No. 17-30303, 2017 WL 4876311 (5th Cir. Oct. 27, 2017)).  In Lane, the Fourth Circuit held that the challenged firearm regulations merely created "minor inconveniences" for gun purchasers that were "distinct from an absolute deprivation" of the Second Amendment right to bear arms, and hence plaintiffs did not have standing to challenge them.  703 F.3d at 673 (comparing the relatively minor regulations in Lane with the more onerous regulations in Ezell and Dearth).  The Fifth Circuit in Bezet made the same distinction, holding that tax and registration laws did not cause a sufficiently concrete indirect injury to a consumer because the laws merely created "additional costs and logistical hurdles" to the receipt of transferred guns.  See 2017 WL 4876311, at *340.  Hence, neither court found that a plaintiff in Reyes's position lacks standing to challenge a law that creates an absolute bar on his ability to obtain a firearm.

predicate conviction is "similar" to an enumerated offense, the government suggests the Court adopt the "elements test" employed by some circuits. Id. at 12. Under the elements test, a conviction qualifies as similar if the government was required to prove as an element of the offense that the defendant caused economic harm to consumers or competition. Id. at 11. Because none of Reyes's predicate offenses had such an element, the government contends that the offenses do not qualify as "similar" under § 921(a)(20)(A). Id. at 13.[3]

Reyes, conversely, interprets the business practices exception more broadly. He contends that Congress intended to exclude from the firearms disability a "broad class" of "business practices that cause harm to the fair and efficient functioning of the commercial marketplace," regardless of whether the offenses at issue have as an element proof of economic harm to consumers or competition. Pl.'s Opp'n at 9, 17. Relying on the history and purpose of securities regulation as well as the elements of his offenses, he asserts that his predicate offenses specifically "pertain" to or are "similar" to unfair trade practices and thus fall within the statutory exclusion. Id. at 11. In the alternative, he argues that his offenses nevertheless satisfy the elements test the government proposes. Id. at 18–20.

---

[3] The government also argues that the fact that federal securities laws were enacted prior to the Gun Control Act weighs against finding that securities violations fall within the business practices exception. See Gov't's Reply at 12. Under the government's theory, any non-enumerated offense that existed prior to the enactment of the Gun Control Act cannot fall within the business practices exception because Congress chose not to identify the offense explicitly in § 921(a)(20)(A). See id. But Congress's initial delegation of authority to the Secretary to designate additional similar offenses was not limited to newly enacted offenses. See Pub. L. No. 90-618, § 921(a)(20)(A), 82 Stat. 1213, 1216 (1968). And when the provision was amended in 1986 to eliminate the phrase, "as the Secretary may by regulation designate," it did not include a temporal limit on which convictions could be deemed "similar" to the enumerated offenses. See Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449, 449 (1986).

Similarly, the government suggests that the specific exclusion of antitrust violations, which were not federal felonies at the time, demonstrates that Congress did not intend to exclude other offenses that were federal felonies at the time. See Gov't's Reply at 22 n.22. But the very purpose of the business practices exception was to except certain felonies—i.e. "crimes punishable by imprisonment for a term exceeding one year"—from the statutory definition. Moreover, § 921(a)(20)(A) excludes both "Federal or State offenses," suggesting that Congress contemplated that some federal offenses could fall within the business practices exception.

In determining the scope of the business practices exception, the Court begins, as it must, with the text of the statute.  See Kingdomware Techs., Inc. v. United States, 136 S. Ct. 1969, 1976 (2016); W. Minn. Mun. Power Agency v. Fed. Energy Regulatory Comm'n, 806 F.3d 588, 591 (D.C. Cir. 2015).   In this case, the statutory language of § 921(a)(20)(A) is clear: it only excludes "antitrust violations, unfair trade practices, and restraints of trade" and "offenses relating to the regulation of business practices" that are "similar" to the three enumerated offenses.  See United States v. Stanko, 491 F.3d 408, 414 (8th Cir. 2007) (noting that the inclusion of the word "similar" "indicates an intent to limit the business practices clause's reach to offenses which are 'comparable' or 'nearly corresponding' to the enumerated offenses" (quoting Webster's Third New Int'l Dictionary 2120 (2002) and United States v. Lindsey, 782 F.2d 116, 117–118 (8th Cir. 1986) (per curiam))).   To be "similar" to the enumerated offenses of antitrust violations, unfair trade practices, and restraints of trade, an offense must share some common quality.  Other courts have found—and this Court agrees—that the common thread that unites the enumerated offenses and those offenses similar to them is that they are commercial offenses that address "economic harm to competition or consumers."  Id. at 416; see also United States. v. Coleman, 609 F.3d 699, 708 (5th Cir. 2010) ("These exempted offenses demonstrate that Congress intended to exclude under § 921(a)(20)(A) only commercial crimes violating statutes designed to prevent 'an adverse economic effect on competition or consumers.'" (citation omitted)).   Hence, Reyes's predicate offenses only qualify as excluded offenses under § 921(a)(20)(A) if the violated statutes relate to the regulation of business practices and are intended to address economic harm to competition or consumers.[4]

---

[4] Reyes suggests that the Court should apply the rule of lenity to resolve any ambiguity in the statute in his favor.  See Pl.'s Opp'n at 16–17.  Here, however, Congress "has spoken in clear and definite language."   Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 409 (2003).  Moreover, even if the statute were ambiguous, courts "do not

The statutory question before the Court, then, is twofold: (1) what factors evince that a commercial offense statute addresses economic harm to competition or consumers and (2) do Reyes's predicate offenses in fact address such harms.  The Court considers each of these questions in turn.

### A.       Identifying the Business Practices Exception Test

Although application of the business practices exception is a matter of first impression in this Circuit, this Court does not write on a blank page.  The elements test, which the government proposes this Court adopt, originated in the Second Circuit in United States v. Meldish, 722 F.2d 26, 28 (2d Cir. 1983).   At that time, the exclusion of "other similar offenses relating to the regulation of business practices" was left to the Secretary and hence a predicate offense could only qualify for exclusion if it constituted an enumerated offense under § 921(a)(20)(A).  In Meldish, the Second Circuit considered whether falsifying a customs declaration constituted an "unfair trade practice" and held that "implicit in the term is the requirement that the practice adversely affect either competitors or consumers."  Id. at 27–28.  Because the elements of the customs offense demonstrated that it "in no way depends on whether it has an effect" on either competitors or consumers, the court found that the offense did not fall within § 921(a)(20)(A)'s exception.  Id. at 28.

Since then, Circuits applying the business practices exception have split in their use of the elements test.  The Seventh Circuit relies exclusively on the elements test, only excluding offenses from the felon-in-possession statute if "the government would have been required to prove, as an element of the predicate offense, that competition or consumers were affected."  United States v. Schultz, 586 F.3d 526, 530 (7th Cir. 2009).  The Fifth Circuit has examined both the elements of

---

resort to the rule of lenity where, as here, we can otherwise resolve the ambiguity of the statute."  Stanko, 491 F.3d at 414 n.5 (citation omitted).

the predicate offense and its legislative history in determining whether it falls within the business practices exception, though it maintains that any analysis of the latter is secondary to an examination of the former.  See Coleman, 609 F.3d at 705–06.  But see Dreher v. United States, 115 F.3d 330, 332–33 (5th Cir. 1997) (examining only the elements).

The Eighth Circuit has taken a more holistic approach to the business practices exception inquiry, considering both the primary purpose of the violated statute and the elements of the predicate offense in determining whether the predicate offense constitutes an excluded offense.  In United States v. Stanko, the Eighth Circuit considered whether a violation of the Federal Meat Inspection Act ("FMIA") pertained to unfair trade practices or other similar offenses.  It concluded that "Congress intended to exclude from § 922(g)(1)'s prohibition those felons convicted under criminal statutes addressing only economic harm to competition or consumers, but not to exclude those felons convicted under criminal statutes designed primarily to address other societal concerns."  Stanko, 491 F.3d at 416.  Whether a commercial offense statute constitutes a qualifying offense under the business practices exception is "evidenced by the primary purpose of the criminal statute and the elements the Government must prove for conviction under it."  Id. at 415.[5]  Because the primary purpose of the FMIA was to protect public health and the violations did not require the government to prove an effect on competition or consumers, the court found that the predicate

---

[5] The government suggests that the "primary consideration" in Stanko was its analysis of the elements of the predicate offenses.  See Gov't's Reply at 10.  Although the Eighth Circuit does note that, "[e]ven more significantly, none of the provisions of the FMIA require the Government to prove an effect on competition or consumers," it does so only within an extensive review of the statute's primary purpose.  See Stanko, 491 F.3d at 417–18.  Throughout the opinion, the court makes clear that both "the primary purpose of the criminal statute and the elements the Government must prove for conviction under it" constitute evidence of whether the predicate offense qualifies under the business practices exception.  See id. at 415; see also id. at 418–19.  It also cites approvingly United States v. McLemore, 792 F. Supp. 96, 98 (S.D. Ala. 1992)—the only case to hold that a predicate offense qualified under the business practices exception—which expressly rejected the elements test and instead looked solely to the purpose of the statute and its placement in Title 15 of the United States Code.  See Stanko, 491 F.3d at 415.  Hence, it is clear in Stanko that an analysis of the elements of the offense is one—but not the exclusive—consideration for application of the business practices exception.

violation of FMIA was not excluded under the business practices exception.  Id. at 418–19; see also United States v. Miller, 678 F.3d 649, 652–53 (8th Cir. 2012) (finding scheme to defraud was not a qualifying excluded offense because the violated statute did "not have the isolated purpose of protecting consumers or regulating business practices" and the elements of the offense did "not involve showing an effect upon consumers or competition").

The government urges the Court to adopt the narrow "elements test" used by the Seventh Circuit or, at the very least, to adhere to the Fifth Circuit's approach by subordinating any consideration of purpose to an examination of the elements of the offense.  See Gov't Mot. at 11–12.  In doing so, it suggests that "the only underlying offenses that may be excluded from the 922(g)(1) [and (d)(1)] firearms prohibition[s] are convictions for 'business practices' that require proof of direct competitive harms."  Id. at 12 (emphasis added).

However, any strict application of an elements requirement would be inconsistent with the explicit terms of the business practices exception.  The three enumerated offenses are not generic common law offenses reducible to specific elements that comprise the crime.  Cf. Taylor v. United States, 495 U.S. 575, 598–99 (1990) (explaining that in a categorical approach sentencing courts look to the elements of the prior offense and compare them to the elements of the "generic" Armed Criminal Career Act crime).  The enumerated categories of offenses—antitrust violations, unfair trade practices, and restraints of trade—each contain multiple, distinct offenses comprised of varying elements.  Antitrust violations, for example, may encompass price-fixing, bid-rigging, and market allocation.  Unfair trade practices may embrace an incalculable number of offenses—"[i]t is impossible to frame definitions which embrace all unfair practices" because "[t]here is no limit to human inventiveness in this field."  FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 240 (1972) (citation omitted).

14

The common thread between the enumerated offenses is that they are commercial crimes intended to address economic harm to competitors or consumers—not that they require proof of such harm as an element of the offense.  Most criminal antitrust violations, for example, are considered to be per se harmful to competition and consumers and require no actual proof of injury.  See, e.g., United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224 (1940) ("Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under [section 1 of the Sherman Act].")  The fact that a business practices offense does not have as an element proof of harm to consumers or competition therefore cannot definitively determine that it is not within the business practices exception in § 921(a)(20)(A).

This is not to say that the elements test is not a useful tool in a court's statutory interpretation arsenal.  Should a predicate offense relating to the regulation of business practices satisfy this test, it would be clear that the violated statute intends to address economic harm to consumers or competition.  But it would be incongruous to require a predicate offense to pass a test that the enumerated offenses themselves do not meet.

The Court therefore finds persuasive the Eighth Circuit's approach in Stanko and adopts its method of examining both the primary purpose and the elements of the predicate business practices offense to determine whether an offense "pertain[s] to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses."[6]  The Eighth Circuit has not made clear,

---

[6] Reyes specifically argues that his offenses "pertain to unfair trade practices or, at a minimum, are similar to such offenses."  Pl.'s Opp'n at 11, 16.  But the Eighth Circuit's approach applies to analyses of both offenses that "pertain to unfair practices" and offenses that are "similar to antitrust violations, unfair trade practices, or restraints of trade collectively."  Stanko, 491 F.3d at 415; see also Miller, 678 F.3d at 651–53 (applying purpose and elements analysis to determine whether predicate offense "pertains specifically to unfair trade practices").  This is consistent with the purpose of the business practices exception test: to identify offenses that share the same qualities as the offenses enumerated in § 921(a)(20)(A).  Hence, a separate examination of whether Reyes's securities offenses are "unfair trade practices" is unnecessary.

however, whether this method requires a predicate business practices offense to satisfy both the purpose and elements prongs of the analysis to be considered a qualifying offense.  In Stanko, the predicate convictions did not satisfy either prong and hence there was no need to address whether satisfaction of just one component of its approach would be sufficient.  See Stanko, 491 F.3d at 418–19 (finding FMIA did not have qualifying primary purpose or elements); see also Miller, 678 F.3d at 653 (same as to fraud statute).  But the court cited approvingly cases that exclusively relied on a consideration of the elements, Stanko, 491 F.3d at 415 (citing Dreher, 115 F.3d at 332–33, and Meldish, 722 F.2d at 27–28), as well as a case that exclusively relied on an analysis of the statute's purpose, see id. (citing McLemore, 792 F. Supp. at 98).  Moreover, as discussed, a business practices offense may fall within the business practices exception even if it does not require proof of economic harm as an element.  The Court therefore concludes that an offense relating to the regulation of business practices qualifies under the business practices exception if an examination of either its primary purpose or the elements of the violation reveals that the offense statute is designed primarily to address economic harm to consumers or competition.

### B.   Examination of Reyes's Predicate Offenses

Finally, then, the Court turns to whether Reyes's three predicate offenses constitute offenses excluded by § 921(a)(20)(A) from the felon-in-possession statute.  All three, the Court concludes, do.

### 1.   Examination of the Elements

The Court begins its analysis by examining whether Reyes's predicate business practices offenses have as an element economic harm to competition or consumers. Reyes was convicted of (1) securities fraud, (2) falsifying corporate books and records, and (3) making false statements to accountants—none of which required the government to prove an effect on competition or

consumers.  See Reyes, 660 F.3d at 459.  Although his convictions for securities fraud and making false statements required the government to prove that Reyes misstated or omitted material facts, see id. at 668; 17 C.F.R. § 240.13b2–2, the government was not required to prove the violations caused actual economic injury.  Moreover, his conviction for falsifying corporate books and records did not even require proof of materiality.  See 15 U.S.C. § 78m(b)(2)(A) (requiring securities issuers to "make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer").  Hence, each of his offenses fails the elements prong of the business practices exception test.

## 2.      Primary Purpose

This failure is not fatal, however, so long as the violated statute has the requisite primary purpose.  The Court therefore proceeds to the second prong of its business practices exception analysis: discerning the primary purpose of the laws and regulations Reyes violated.  Because an analysis of the primary purpose of the overarching statute may illuminate the more specific purpose of the provisions Reyes violated, the Court will begin with the Exchange Act.

### i.      The Securities Exchange Act of 1934

"Examination of purpose is a staple of statutory interpretation[.]"  McCreary Cnty. Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 861 (2005).  This inquiry does not require "psychoanalysis of a drafter's heart of hearts," but instead relies on objective indicia of the law's purpose.  Id. at 862.  "The eyes that look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act."  Id. (quoting Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308 (2000)).  Because laws are not enacted in a vacuum, the "plain meaning

of the statute's words [is] enlightened by their context" and "the specific sequence of events leading to passage of the statute." Edwards v. Aguiliard, 482 U.S. 578, 594–95 (1987).

Here, the history and stated purpose of the Exchange Act clearly indicate that the statute was primarily intended to prevent economic harm to investors. Following rampant abuses in the sales of securities and the subsequent crash of the stock market in 1929, Congress enacted the first federal laws specifically regulating securities. The Securities Act of 1933 was enacted "[t]o provide full and fair disclosure of the character of securities sold in interstate and foreign commerce, and through the mails, and to prevent frauds in the sale thereof, and for other purposes." 48 Stat. 74, 74 (1933). One year later, Congress enacted the Exchange Act, which established the SEC and was intended "[t]o provide for the regulation of securities exchanges and over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets, and for other purposes." 48 Stat. 881, 881 (1934). Together, these Acts regulated the business practices that had led to financial ruin for thousands of investors.

This new statutory scheme was intended not only to redress actual economic harm to investors, but also proactively to prevent the occurrence of such harm in the future. To do so, the Exchange Act imposed disclosure requirements, which serve as prophylactic measures to protect investors from incomplete market information. See, e.g., 15 U.S.C. § 78m(b)(2) (requiring securities issuers to maintain reasonably detailed records). "The theory behind th[is] federal regulatory framework is that investors are adequately protected if all aspects of the securities being marketed are fully and fairly disclosed[.]" 3 James D. Cox & Thomas Lee Hazen, Cox & Hazen on Corporations 1582 (2d ed. 2003); see also Edward J. Balleisen, Fraud: An American History from Barnum to Madoff 249–252 (2017) (describing the history of the development of the federal

securities laws and noting "their central aim was to construct a new set of norms and practices about communicating truthful financial information"). The Exchange Act therefore regulates not only conduct that has caused or could cause consumer harm but also conduct that may in the aggregate lead to increased risk of economic loss by investors.  Thus, like the statutes referenced in the business practices exception, the Exchange Act "lay[s] down a scheme of acceptable and unacceptable behavior by imposing direct restraints against certain business procedures[] and requirements and regulations for the carrying out of a business enterprise" for "the purpose of protecting the consumer while promoting appropriate competitive business and pricing practices." United States v. Kruckel, Crim. A. No. 92-611(JBS), 1993 WL 765648, at *16 (D.N.J. Aug. 13, 1993).

Although not determinative,[7] the Exchange Act's placement in the United States Code also suggests that it is similar to the laws violated by the enumerated business practices offenses.  The Act was codified in Title 15 of the United States Code, which pertains to "Commerce and Trade," and includes both the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, and laws governing unfair trade practices, see, e.g., Federal Trade Commission Act, 15 U.S.C. §§ 41–58.  Its placement in Title 15 serves as additional evidence that violations of the Securities Exchange Act share some family commonality with the Title 15 offenses enumerated in § 921(a)(20)(A).   See McLemore, 792 F. Supp. at 98 (finding odometer rollback qualified as an "unfair trade practice" under § 921(a)(20)(A) because the offense was located in Title 15 and was intended to "protect

---

[7] The United States Code is prepared and published by the Office of the Law Revision Counsel of the U.S. House of Representatives, not by Congress.  See Preface, United States Code, at v. (1934 ed.) (explaining that the U.S. Code is a compilation of the law prepared by a committee of the House of Representatives).  Hence, while a statute's placement in a particular title may indicate it is generally thought to share common qualities with other statutes in that title, it is not determinative of whether Congress itself viewed the statutes as similar.

consumers from the annual $2 billion cost to car buyers who overpaid for cars due to the cars' understated mileage").

The statute's text and history, as well as its placement within the U.S. Code, thus reflect only one singular purpose: the Exchange Act "was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges." Koch v. SEC, 793 F.3d 147, 150 (D.C. Cir. 2015) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976)); see also Basic Inc. v. Levinson, 485 U.S. 224, 230 (1988) ("The 1934 Act was designed to protect investors against manipulation of stock prices."). It is therefore clear that the purpose of the Act as a whole is to regulate business practices in order to protect investors—i.e., purchasers of securities in the securities market—from economic harm.

### ii.      Reyes's Predicate Convictions

Although it is apparent that the federal securities statutory scheme as a whole is intended to protect investors, Reyes's specific predicate convictions must themselves qualify as excluded offenses under the business practices exception. See Miller, 678 F.3d at 652 (examining the purpose of the specific violated statutory provision). The Court therefore examines the specific violated provisions to determine whether each business practices offense has as its primary purpose the protection of investors.

Reyes was convicted of securities fraud and making false filings with the SEC in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5. Reyes, 660 F.3d at 460. Under 15 U.S.C. § 78j(b), it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." This provision is further defined by 17 C.F.R. § 240.10b–5 as

prohibiting "any untrue statement of a material fact or [omission of] a material fact . . . in connection with the purchase or sale of any security."   Hence, to convict Reyes under these provisions, the government was required to prove that he made "a (1) misleading (2) statement or omission (3) of a 'material' fact (4) . . . with scienter."   United States v. Smith, 155 F.3d 1051, 1063 (9th Cir. 1998).

The explicit text of 15 U.S.C. § 78j(b) and the materiality requirement of the securities fraud offense together demonstrate that the securities fraud and false filing statute that Reyes violated was primarily intended to protect investors from economic harm.   The text of 15 U.S.C. § 78j(b) provides that regulations under that provision are limited to those made "for the protection of investors" or "in the public interest."   15 U.S.C. § 78j(b) (emphasis added).   To the extent that provisions "made 'in the public interest'" could, in theory, be distinguishable from those made "for the protection of investors," the Court need not and does not express an opinion; here, the materiality element of SEC Rule 10b–5 confirms that the regulation Reyes violated was made "for the protection of investors."   A fact is only "material if there is a substantial likelihood that a reasonable investor would consider it important in making a decision" by "alter[ing] the 'total mix' of information made available."   Reyes, 660 F.3d at 468 (emphasis added).   A Rule 10b–5 offense is therefore explicitly tied to protecting the investor's interest in having complete information to minimize economic risk.   Thus, even though a Rule 10b–5 conviction does not require the government to prove as an element that any investor in fact "was affected" by relying on the information, or that the misrepresentation resulted in economic loss—a prerequisite of satisfying a strict application of the elements test—the language of 15 U.S.C. § 78j(b) and of the Rule 10b–5 offense's materiality element confirm that the predicate securities fraud and false filing offenses have the requisite primary purpose of preventing adverse effects on securities purchasers.

Similarly, Reyes's convictions for making false statements to auditors under 17 C.F.R. § 240.13b2–2 required proof that he knowingly made a "materially false or misleading statement to an accountant."  See United States v. Goyal, 629 F.3d 912, 916 n.6 (9th Cir. 2010) (noting that the statements must be "knowingly" made).  To convict Reyes, the jury was required to find that the false statements were "capable of misleading investors."  United States v. Reyes, 577 F.3d 1069, 1076 (9th Cir. 2009).  This too confirms that 17 C.F.R. § 240.13b2–2 was primarily intended to protect investors.

Finally, Reyes was convicted of falsifying corporate books and records, which required a finding that he knowingly failed to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 78m(b)(2)(A); see also 17 C.F.R. § 240.13b2–1 ("No person shall directly or indirectly, falsify or cause to be falsified, any book, record, or account[.]").  Like the other offenses, this requirement supports the Exchange Act's disclosure system, which is "based on the premise that 'No investor can safely buy or sell securities without having an intelligent basis for forming his judgment as to the value of the securities he buys or sells.'"  Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act Release No. 15570, 1979 WL 173674, at *8 (Feb. 15, 1979) (citation omitted).  As such, the SEC determined that the bookkeeping provision was "'necessary or appropriate' in the public interest, for the protection of investors and to insure fair dealing in securities."  Id. (emphasis added).

To provide even greater protection to investors, the SEC rejected the imposition of a materiality standard for the bookkeeping provision.  Id. at *9 (noting the SEC's "concern that a limitation concerning 'material' falsity would unduly narrow the scope of the rule and result in an

unwarranted diminution of investor protection"). Thus, issuers are required to provide all information in reasonable detail, even if such information would not be considered important by a reasonable investor. Because violations of the bookkeeping provision could lead "to the concealment of material information that should be disclosed in periodic reports or to purchasers and sellers of the issuer's securities," the SEC imposed the bookkeeping requirement as a separate, antecedent measure to ensure that investors remained fully informed and able to minimize the economic risks associated with overvalued stock. Id. at *10. Hence, it is clear that the primary purpose of the bookkeeping provision was to protect investors from economic harm.

Each of Reyes's predicate business practices offenses, then, possesses the requisite primary purpose under the business practices exception. There may be instances in which a statutory provision's primary purpose is not so easily divined. See Sissel v. U.S. Dep't of Health and Human Servs., 799 F.3d 1035, 1054 (D.C. Cir. 2015) (Kavanaugh, J., dissenting) (noting "it is extremely difficult for a Court to identify one predominant purpose"). This, however, is not such a case. Here, it is clear that the violated provisions regulate business practices by securities issuers to prevent deceptive half-truths or affirmatively misleading statements regarding the stability of a company or the value of its stock. Such laws and regulations primarily ensure that investors have sufficient information to make informed decisions to minimize their risk of economic loss—i.e., they are primarily concerned with protecting securities purchasers through the regulation of business practices.

\*      \*      \*

The Court concludes that each of Reyes's predicate offenses satisfies the primary purpose prong of the business practices exception test and therefore is excluded from the definition of

"crime[s] punishable by imprisonment for a term exceeding one year."[8]  The business practices exception in § 921(a)(20)(A) excludes from the felon-in-possession statute only predicate offenses relating to the regulation of business practices that are designed to address economic harm to competition or consumers.  An offense relating to the regulation of business practices qualifies under the exception if either its primary purpose or the elements of the violation demonstrate that it was primarily intended to address such harm.  While none of Reyes's predicate convictions required the government to prove as an element of the offense direct harm to competition or consumers, the text and history of the Exchange Act generally, and an examination of each of Reyes's predicate offenses specifically, evince that those offenses regulate business practices primarily to protect securities purchasers from economic harm.  Hence, each of Reyes's predicate offenses "pertain[s] to antitrust violations, unfair trade practices, or other similar offenses relating to the regulation of business practices" under § 921(a)(20)(A) and thus does not trigger the application of the felon-in-possession statute.

Because the Court concludes that § 922(d)(1) and (g)(1) are not applicable to Reyes, the Court will not consider the constitutional challenges he raises in the alternative.  The Court will also deny Reyes's motion for leave to file a surreply.  A separate order has been issued on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:  September 28, 2018

---

[8] Because the Court finds that Reyes's predicate offenses fall within the business practices exception, the Court will not consider Reyes's additional argument that any distinction between § 921(a)(20)(A)'s enumerated offenses and his securities violations would pose constitutional problems. See Pl.'s Opp'n at 17.